**NATIONAL THEME PRODUCTIONS, INC., etc., et al., Plaintiffs,**

v.

**JERRY B. BECK, INC., etc., et al., Defendants.**

Civ. No. 87–0499–GT(M).

United States District Court, S.D. California.

Aug. 29, 1988.

Arlington R. Robbins, Michael V. Pundeff, co-counsel, Robbins, Keehn and Jones, San Diego, Cal., for plaintiffs.

Hallen D. Rosner, Law Offices of Hallen Rosner, San Diego, Cal., for defendants.

## MEMORANDUM OF DECISION AND ORDER

GORDON THOMPSON, Jr., Chief Judge.

This matter came before the court on August 3, 1988, for hearing arguments in a stipulated facts trial. Plaintiffs seek an order permanently enjoining Defendants from manufacturing, promoting, displaying, distributing and selling four of Plaintiffs' products, or products which are substantially similar thereto, on the grounds of federal copyright infringement. These parties were last before the court two months ago for hearing Defendants' motion for summary judgment. A four week jury trial was scheduled to begin three weeks after the motion. In the interim, the parties reached an out-of-court settlement on all but one cause of action. They elected to proceed by way of this stipulated facts trial, limiting the action to four allegedly infringed works and limiting the relief requested as specified above. The court orally ruled for Plaintiffs at the August 3 hearing. This Memorandum sets forth the basis for the court's order and incorporates the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52.

FACTS

I. *The Parties*

This is a civil action for the infringement of United States Copyright Registrations VA 255–451, VA 255–242, and VA 304–848, copyrights on artwork on masquerade costumes. Plaintiff National Theme Productions ("NTP") is a California corporation with its principal place of business in San Diego, California. Plaintiffs Paul Sullivan, Paul Thomas and Walt Hensey are individuals and principal shareholders of NTP. NTP designs Halloween and masquerade costumes and sells its costumes to the public through leased concessions in approximately 1,000 department stores across the United States, including Sears Roebuck, J.C. Penney, and The Broadway.

Defendant Jerry B. Beck, Inc. is a California corporation with its principal place of business in Los Angeles, California. Defendant Jerry B. Beck is the President of Jerry B. Beck, Inc. (hereinafter collectively referred to as "Beck" or "Defendant"). Beck has produced and sold women's sportswear for a number of years.

II. *The Infringed Articles*

A. Rabbit In Hat

In early 1986, NTP's employees created a totally new design concept for a Halloween masquerade costume which would enable the wearer to portray the familiar magic trick of a rabbit emerging from a top hat. NTP's newly-designed costume was manufactured by Beck for NTP and was first sold as "Rabbit In Hat" by NTP during the 1986 Halloween season. At the time the Rabbit In Hat costume was first created and marketed in 1986, there was no other costume similar to it on the market.

NTP's employees worked with a number of different concepts, ideas, drawings, and sketches of the Rabbit In Hat costume before settling on a final design for production. The idea evolved out of NTP's use of wire hoops in clown costumes. The hoops were employed to create a three-dimensional sculptural effect extending beyond the body of the wearer.

NTP's Rabbit In Hat costume consists of an integrated one-piece body, the lower half depicting an inverted three-dimensional black satin top hat and the upper portion portraying a rabbit projecting above the brim and coming out from within the inverted top hat. The inverted top hat portion has a large brim approximately 3½ feet in diameter that projects substantially away from the body of the wearer in a circular fashion at waist level and is shaped and held away by the use of two different sized parallel wire hoops sewn into the brim. The "stove pipe" portion of the in-

verted top hat is designed to hang to the ankles of the wearer with another wire hoop of approximately two feet in diameter sewn in at the bottom of the costume to create the circular shape of the "stove pipe" portion of the hat. The upper portion of the costume is made to portray a fat white rabbit with a pink belly and a connected "cotton tail," with the rabbit emerging out of the hat. The rabbit portion of the costume is connected to the brim at about the waist level of the wearer, and stands substantially away from the wearer in a circular fashion to portray the fat rabbit concept. A separate white, matching, tie-on hood piece with stand-out rabbit ears integrated into the hood design is included with the costume, with the inner portion of the stand-out ears made of the same matching pink material as the pink belly of the rabbit.

The Rabbit In Hat costume was designed and is marketed by NTP as a novelty item intended exclusively as a wearable toy for masquerade purposes to portray the magic trick of a rabbit being drawn out of a hat.

Due to the use of the multiple wire hoops and the resulting bulky design, the Rabbit In Hat costume does not readily permit the wearer to sit, recline, or maneuver easily. Since it requires one to normally remain in a standing position while wearing the costume, NTP's designers intended the costume to be worn as an outer shell over regular clothing that would permit its total removal to allow full participation at functions such as costume parties. For example, the model on the packaging insert is wearing a white turtleneck top underneath the rabbit portion of the costume. The sheerness of the fabric in the top hat portion of the costume requires clothing to be worn underneath as well, even if the costume were not designed to be removed.

### B. Tigress

In early 1985, NTP's employees designed the "Tigress" costume as a highly original Halloween masquerade costume intended to create a fanciful impression of a feline animal rather than an anatomically accurate portrayal of such an animal.

The concept or idea for the costume was derived from the musical "Cats." The newly designed costume was manufactured by Beck for NTP and was first sold by NTP as "Tigress" during the 1985 Halloween season. At the time the Tigress costume was first created and marketed in 1985, there was no other costume design substantially similar to NTP's Tigress costume on the market. NTP's employees worked with a number of different concepts, ideas, drawings, and sketches of the "Tigress" costume before settling on a final design for production.

The Tigress costume sold by NTP consists of four pieces: (1) a narrow, triangular-shaped, thin piece of tie-on leopard print fabric that hangs down the front and back of the wearer and has three-dimensional padded animal feet with four individual white felt claws sewn on as the shoulders; (2) a long, padded, wire tail covered with matching fabric.and a fur-like tip; (3) a plastic headband with matching fabric stand-up ears attached; and (4) short black sleevelets for the lower arm with fur trim ringlets attached.

The Tigress costume was devised and is marketed by NTP as a novelty item intended as a wearable toy to be placed over a leotard or other adequate body covering solely for masquerade purposes. The costume cannot be worn without a separate body covering underneath as it is too narrow to cover a woman's chest and contains no sides or bottom.

### C. Magic Dragon

In 1985, NTP's employees designed a child's costume that would be a fanciful rendition of a dragon, the body part of which could also be worn as a sleepwear. The newly designed costume was manufactured by Beck for NTP and first sold as "Magic Dragon" by NTP during the 1985 Halloween season. At the time NTP's "Magic Dragon" costume was first created and marketed in 1985, there was no other costume similar to that costume on the market.

NTP's Magic Dragon costume consists of two pieces: (1) a body suit in two versions

made of green and yellow felt-like material with integrated rubberized soles designed as a child's sleeper and a larger child's version without such rubberized soles wearable as a pajama, and (2) a tie-on headpiece of matching fabric which depicts a dragon with black and white stand-up plastic eyes, black fabric nostrils, a red fabric tongue, and a long integrated tail piece with a sculptured and padded green body and yellow fabric triangles attached along the tail to resemble a tail with fins and a snared end.

The Magic Dragon costume was designed by NTP as a novelty item intended for masquerade and as sleepwear without the integrated headpiece. The headpiece is not physically attached to the body of the costume, and customers are advised to remove the headpiece of the costume from the child before allowing the child to use the body portion as sleepwear.

NTP claims copyright protection only the hood and tail headpiece of the costume as a wearable toy.

D. Pampered Pup

In 1986, NTP's employees designed a child's costume that would be a fanciful rendition of a puppy dog, the body portion of which could also be worn incidentally as a pajama. The newly designed costume was manufactured by Beck for NTP and was first sold by NTP as "Pampered Pup" during the 1986 Halloween season. At the time the Pampered Pup costume was first created and marketed in 1986, there was no other costume similar to that costume on the market.

NTP's "Pampered Pup" costume consists of three pieces: (1) a body piece made of black and white material to resemble a spotted dog; (2) two large "paw gloves" made of the same material; and (3) a slip-on hood of matching black and white fabric with cut-out eyeholes, two floppy hound dog-type fabric ears, a red fabric "tongue" and a red "nose" two inches in diameter.

The Pampered Pup costume was designed by NTP as a novelty item intended primarily for masquerade, with only the body piece made to serve in the alternative as a pajama. If it is to be used as a pajama, customers are advised to remove the paws and hood of the costume from the child.

NTP claims copyright protection in the exterior appearance of the entire costume as an integrated ensemble of its component parts, resulting in the portrayal of a large puppy dog similar to an animated, stuffed animal. NTP contends, and Beck has not contested, that the costume could be stuffed and independently displayed as a fanciful soft sculpture portraying a spotted puppy dog.

III. *Relationship Between Parties*

During 1985 and 1986, NTP used Beck to produce most of its costume line. Beck was responsible for making the arrangements to purchase fabrics, contract with cutting and sewing contractors for costume production, package the costumes and deliver the completed costumes as directed by NTP. NTP paid the contractors and suppliers directly; it paid Beck a fixed amount for each costume.

In 1985 and 1986, NTP provided Beck with several new costume designs in accordance with the parties' arrangement. Beck produced these costumes, including the four costumes at issue in this case: "Rabbit In Hat," "Tigress," "Magic Dragon," and "Pampered Pup." These costumes are covered by the Certificates of Registration presented as Exhibits 17, 18 and 19.

IV. *Alleged Infringement*

NTP and Beck terminated their relationship in November 1986. Over NTP's objections, Beck retained the patterns and markers which had been used to produce the NTP costumes. The patterns and markers retained included the ones for the four costumes at issue. In 1987, Beck used these patterns and markers to make his own line of Halloween and masquerade costumes which he sold under the trade name "California Costume Collections."

Beck appeared at toy and costume trade shows in New York in February 1987, and

in Chicago, in April 1987, to obtain wholesale orders for his costumes. Defendant operated booths at the shows displaying approximately one hundred of the costume styles that Beck had previously manufactured for NTP. Beck also used two "catalogs" for his trade show displays. The catalogs were three-ring binders which were filled with NTP-produced packaging inserts showing pictures of models wearing the costumes as manufactured for NTP by Beck. Beck cut off or covered up NTP's name and copyright notices on the inserts; the name California Costume Collections appeared instead. Copies of the costumes and inserts were also used to solicit orders from wholesale buyers at private sales presentations. Defendant obtained no authorization from NTP to use any of the costumes or inserts.

Among the costumes displayed were: "Rabbit In Hat," (which Beck later called "Rabbit In The Hat"), a child-size version of "Rabbit In The Hat" (a scaled-down size of Beck's adult version), "Tigress" (which Defendant later called "Lady Tigress"); "Magic Dragon" (which Beck later called "Child Dragon"; and "Pampered Pup" (which Beck later called "Hound Dog"). Inserts depicting the four costumes at issue also appeared in the catalog.

Beck produced sufficient quantities of the costumes to fill nearly all the purchase orders he procured. He shipped these costumes in August, September and October of 1987. The shipments included a substantial number of modified versions of the four costumes at issue. Defendant will continue to manufacture, promote, display, distribute and sell these costumes or substantially similar costumes, unless prohibited from doing so by the court.

## DISCUSSION

[1] A plaintiff need only prove ownership of the copyright and copying to prevail on an infringement claim. 3 M. Nimmer, *On Copyright*, § 13.01 (1987). These two elements have several constitutent parts. The parties have simplified the court's inquiry here by stipulating that only two issues need be decided: (1) whether the costumes contain sculptural or artistic elements that are separable from any utilitarian function, entitling the costumes to copyright protection; and (2) whether Defendant's costumes are substantially similar to Plaintiffs', justifying the entry of a permanent injunction against infringement. The first issue relates to ownership; the second to copying. All other aspects of the infringement claim are deemed admitted.

## I. *Ability to Copyright Costumes*

[2] The registration certificates covering the costumes at issue in this case were obtained through the deposit of Plaintiffs' packaging inserts with the copyright office. The Packaging Inserts serve as a label for the costumes and contain a photograph of a model wearing the costume. The copyrights allegedly protect: "Text, Graphics[,] Photographs, and Original Artistic Expression of Accessory Items Shown in Photographs—No claim is made on designs of clothing, but in designs of artwork on clothing," or, in the case of Magic Dragon, "Photographs; graphics, compilation of terms; sculpture and artwork in masquerade costumes and accessory items shown in photographs; no claim is made on functional designs of clothing." The certificates constitute *prima facie* evidence of the validity of the copyright. Defendant contends the costumes contain no separable artistic elements which would entitle them to copyright protection.

[3] This court has previously ruled that costumes have an intrinsic utilitarian function; thus, they cannot be copyrighted as costumes. The court has thought and rethought this issue and declines NTP's invitation to rehash that ruling yet again. The costumes are copyrightable, if at all, to the extent that they have features which can be identified separately and are capable of existing independently as a work of art. *Fabrica, Inc. v. El Dorado Corp.*, 697 F.2d 890, 893 (9th Cir.1983). The features only need be conceptually separable from the utilitarian functions of the garments to be entitled to protection under copyright law. *Kieselstein–Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989, 993 (2nd Cir.1980).

■ The objective behind the conceptual separability test is to distinguish copyrightable applied art from uncopyrightable industrial design. *See* H.R.Rep. No. 1476, 94th Cong., 2d Sess. 54, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5667. The Second Circuit, noting the difficulty that courts were having drawing such lines, adopted the test set forth by Professor Denicola in *Applied Art and Industrial Design: A Suggested Approach to Copyright in Useful Articles,* 67 Minn.L. Rev. 707 (1983). *Brandir Intern., Inc. v. Cascade Pacific Lumber Co.,* 834 F.2d 1142 (2nd Cir.1987). Under the test, a useful article will be denied protection if:

> the design elements reflect a merger of aesthetic and functional considerations. Conversely, where design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences, conceptual separability exists.

*Id.* at 1145. The test does not require that applied art be completely divorced from utilitarian concerns, but only that the artistic form not be influenced "in significant measure" by functional considerations. *Id.* at 1145–47. In making a determination, the court is expected to examine evidence relating to the design process and nature of the work. *Id.*

According to Denicola, copyrightability "ultimately should depend on the extent to which the work reflects artistic expression uninhibited by functional considerations." 67 Minn.L.Rev. at 741. His test reflects the fact that "some forms are more responsive to utility, and thus less the product of untrammeled aesthetic visions than others." *Id.* at 747. The court's job is to decide where on the continuum a particular article lies.

■ The court concurs with the Second Circuit's adoption of the Denicola test to the extent it requires one to look to an artist or designer's creative process, and the decisions going into that process, in creating a useful article. To the extent that the decision in *Brandir* relies upon the sequences of actions or decisions made in putting together an article, the court believes the Second Circuit improperly applied the Denicola test. As this court reads the Denicola article, sequentially and chronologically dependent results go beyond Denicola's intent, and will cause decisions to turn upon "largely fortuitous circumstances" occurring during the creative process. *Brandir,* 834 F.2d at 1151 (Winter, J., concurring in part and dissenting in part).

■ The costumes at issue here are comprised of garments and/or accessory items. They lie on the margin of utility. Their primary purpose is to permit the wearer to masquerade. They are held to be useful articles nonetheless, because they are made up of items which are meant to be worn. *See Fabrica,* 697 F.2d at 893 (interpreting statute to encompass an article with any intrinsic utilitarian function as a useful article). *Cf. Gay Toys, Inc. v. Buddy L. Corp.,* 703 F.2d 970, 973 (6th Cir.1983) (only function of toy airplane is to portray real airplane). The costumes were not, however, designed to optimize their function as clothing.

■ The costumes' design and form have little to do with their suitability as wearing apparel. Neither the Tigress nor the Rabbit In Hat costume function well as articles of clothing. Both costumes require the masquerader to don other more conventional garments or risk indecent exposure. Moreover, the Rabbit In Hat design does not permit one to move freely or sit easily. Similarly, the Magic Dragon hood does not work well as either a hat or sleepwear hood. In fact, NTP included a notice with the Magic Dragon costume suggesting that the hood be removed if the matching pajama were to be used as sleepwear for safety reasons. NTP also suggested that the Pampered Pup dog-head hood and detachable paws be removed before bedding down for the night.

The Tigress, Rabbit In Hat, Magic Dragon and Pampered Pup costumes primarily represent the artists' arbitrary conceptions responsive to their aesthetic sensibilities. The three dimensional nature of the costumes does not bar their classification as applied art. Denicola, 67 Minn.L.Rev. at

744–45. The final expression of these costumes is no more determined by their function than the pencil sharpener shaped like a telephone in *Ted Arnold, Ltd. v. Silvercraft Co.*, 259 F.Supp. 733 (S.D.N.Y.1966), the wearable bear paw slipper in *Animal Fair, Inc. v. Amfesco Industries, Inc.*, 620 F.Supp. 175 (D.Minn.1985), *aff'd mem.*, 794 F.2d 678 (8th Cir.1986), and the animal-shaped children's backpacks in *Act Young Imports, Inc. v. B and E Sales Co.*, 673 F.Supp. 672 (S.D.N.Y.1987), all of which were found to be copyrightable. The costumes' artistic features simply do not advance their utilitarian purpose as clothing or accessories. *See Brandir*, 834 F.2d at 1145 (artistic features incorporated on torsos in *Carol Barnhart, Inc. v. Economy Cover Corp.*, 773 F.2d 411 (2d Cir.1985) designed to further utilitarian goal). Given the minimal functional considerations which went into the design of the costumes, the court holds they should be afforded protection as applied art under the copyright law.

For example, the overall shape of the Rabbit In Hat costume constitutes an independent artistic element which constitutes the artists' communication of their aesthetic judgments exercised independently of functional considerations. The Tigress costume arguably is not a garment at all, but a collection of accessories. The Tigress pieces—the triangular-shaped leopard print top piece, the padded fabric wire tail, the fabric ears and the fur-trimmed sleevelets —reflect NTP's judgment of how to best present a feline-type costume in the manner of the "Cats" musical. The Magic Dragon headpiece is actually physically separate from the pajama bottom. As mentioned earlier, it does not function well as a hat, cap or hood. The expression embodied in the eyes, nostrils, tongue and tail with fins and a snared end create an artistic concept of a dragon. Similarly, the color selections, placement and size of the spots on the Pampered Pup pajama, and the configuration and expression of the pup head and paws reflect unfettered artistic license.

## II. *Substantial Similarity*

The second element a plaintiff must prove in an infringement action is copying. Ordinarily copying is shown by proof of access and substantial similarity. *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1018 (9th Cir.1985). For obvious reasons, the parties managed to stipulate that only similarity was at issue here. Defendant's basic argument is that NTP is trying to claim a monopoly on the ideas of rabbit in a hat, tigress, dragon and puppy costumes. Beck contends that any similarity in the costumes is due to similarities of expression which result from common ideas and, additionally, that the ordinary reasonable person would not recognize the Beck costumes as substantially similar to Plaintiffs'.

It is axiomatic that 'copyrights protect expressions of ideas, rather than the ideas themselves. 17 U.S.C. § 102(b); *Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954). In determining whether plaintiff seeks to protect an idea or the expression of an idea, courts still turn to Judge Learned Hand's "abstractions test." *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1163 (9th Cir.1977) (citing *Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (2nd Cir.1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931)). When an abstraction is so general that a copyright in it would unnecessarily hinder rather than promote the arts, then the abstraction is an unprotectible idea. *Id.*

Plaintiffs are not seeking copyright protection on the general ideas for these four costumes. Plaintiffs' expression of a rabbit in a hat, a female tiger, a dragon and a puppy dog does not necessarily flow from the "idea" of the costumes. *See id.* at 1168 (idea and expression coincide when expression provides nothing new or added over the idea). These ideas can be expressed in a multitude of ways.

NTP's "Rabbit In Hat" is an an integrated costume consisting of an upper rabbit portion and a lower hat portion. The upper and lower portions need not have been integrated in a one-piece design, joined at the

waist, as in NTP's costume. The "top hat" portion could have been designed as a removable, separate unit coupled with a full rabbit costume creating an apparent separation between the rabbit costume and the hat. The rabbit could have been made in a "Playboy bunny" type of design with an exposed "leggy" look and an even more impressionistic rabbit for the upper portion, stressing a "sexy" look using the impressionistic approach so effective in Tigress. The rabbit could have been depicted as peeking over the brim of the hat, or the hat brim located at the knees of the rabbit. Moreover, the rabbit need not have been fat. The hat neither needed to be squarish nor extended to the feet; and its brim could have been flat. In short, the idea is not "only capable of expression in more or less stereotyped form." *Cf. Harvey Cartoons v. Columbia Pictures Industries, Inc.*, 645 F.Supp. 1564, 1570 n. 9 (S.D.N.Y. 1986).

Similarly, the ideas of a tigress, dragon and puppy dog can be expressed in a multitude of ways which differ from that of NTP's costumes. Far from being a "generic" rendition of a tigress, NTP's "Tigress" costume consists entirely of arbitrary and fanciful design features, including, a V-shaped front piece, padded shoulder pads in the shape of animal feet, fur trimmed lower arm sleevelets, and an animal-earred headpiece, which distinguish it from the fundamental concept of a tiger. "Tigress" does not share common elements with other costumes based on being "designed to fit a human torso to be worn in public and to portray a character." It is collection of accessory items designed purely as an impressionistic design to convey a fanciful perception of a female tiger.

NTP's "Magic Dragon" also cannot be said to be indistinguishable from the standard idea of a dragon (if such a thing exists other than in the imagination of man and in mythology and folklore). The specific color combinations, the length of the tail, the arbitrary placement of the eyes, ears, nose on the sculptured headpiece, as well as the arrangement and coloration of the fins are all extremely variable.

NTP's "Pampered Pup," while based on a more common idea, is by no means a standard rendition of the idea of a puppy. The pattern of the "coat," the colors, the facial expression, the size and shape of the ears and paws are all features that could have been communicated quite differently while portraying the same idea. Other artists might have chosen to depict a different breed or to be more or less fanciful in their renditions.

NTP can establish infringement only if it shows substantial similarity in both the ideas and the expressions of the works. *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985). The ideas are obviously similar. Both parties are producing rabbit in a hat, tigress, dragon and puppy costumes. The subject matter, materials and type of art work are virtually identical.

■ Whether or not the *expression* of the parties' costume ideas is substantially similar depends upon the intrinsic response of the ordinary reasonable person. *Krofft*, 562 F.2d at 1164. Duplication or near identity of the items is not required. *Id.* at 1167. Upon examination of the evidence, it is obvious that Defendant has captured the total concept and feel of NTP's protected expression. The slight variations in color or fabric which can be observed under close inspection do not change the court's opinion. The similarities between the costumes are overwhelming; the differences virtually undetectable or insignificant.

The costume Beck displayed, manufactured and sold as "Rabbit In The Hat" for the 1987 Halloween season is essentially the same costume produced by Plaintiffs in 1986 as "Rabbit In Hat." The variations are minor. Defendant made his costume in two sizes: an adult size and a child size, which was a scaled-down version of the adult size. Defendant used a slightly different shade of pink for the oval belly and the rabbit ears, a smaller cotton tail, and a different mix of synthetic materials for their costumes, which resulted no readily apparent differences in the appearance of the costumes or sheerness of the materials.

Beck displayed and sold a tigress costume in 1987 which was substantially similar in appearance, design and materials to NTP's 1986 "Tigress." The costume actually manufactured and sold by Beck was renamed "Lady Tigress." The costume incorporated the same elements as "Tigress." The only differences between the costumes are: (1) Beck used simulated tiger-stripe fabric instead of simulated leopard spot fabric; (2) some of Beck's costumes were in a brown and gold tone like NTP's, while others were in a gray and black tone; (3) Beck's simulated fur trim was of a different texture and shorter in length than that used by NTP; and (4) the fabric content on the Beck costumes was slightly different, although it was not apparent except as to differences in color and pattern. The costumes are the same in their configurations, shapes, sculptural aspects and component parts. One looking at them would assume they were the same costume.

The two dragon costumes (child and toddler size) Beck Displayed as "Magic Dragon" at the 1987 New York and Chicago trade shows and to others at private showings were substantially the same in appearance design and materials as NTP's 1986 "Magic Dragon" child and toddler costumes. The costumes actually manufactured and sold by Beck were renamed "Child Dragon." Before manufacturing and selling the "Child Dragon," Beck made the trim and tie on the dragon hood yellow instead of NTP's green; he added one more simulated yellow fin to the tail of the hood; he used a single, rather than a double, pointed tongue; and he changed the fabric so that NTP's dragon colors seem to be slightly deeper and brighter. The overall impression is of the exact same costume. In fact, the court had difficulty detecting any differences between the costumes until the differences were pointed out by counsel.

Beck displayed a puppy costume at the 1987 New York and Chicago trade shows and in private sales calls as "Pampered Pup." The costume Beck manufactured was actually sold as "Hound Dog." The costume was essentially the same as NTP's "Pampered Pup," except that the black and white sides of the head, along with the opposing color ears and spots, were reversed. The spots on the head are positioned slightly differently. However, in order to detect any differences between the costumes, one must examine them carefully; the distinctions are not readily apparent.

The court therefore holds that Plaintiff has established substantial similarity in both the ideas and expression between the parties' renditions of the costumes in issue.

## CONCLUSION

Plaintiffs have carried their burden of showing both ownership of the copyrights to "Rabbit In Hat," "Tigress," "Magic Dragon," and "Pampered Pup" and that Defendant's versions of these costumes captured the total concept and feel of Plaintiffs' costumes.

Accordingly, Plaintiffs are entitled to a permanent injunction prohibiting the manufacture, promotion, display, distribution and sale of "Rabbit In Hat," "Tigress," "Magic Dragon," and Pampered Pup" costumes or costumes which are substantially similar thereto.

IT IS SO ORDERED.